Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Jacob A. Snow (SBN 270988)
jsnow@aclunc.org
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Counsel for Plaintiffs*
*(continued on next page)*

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JUSTIN SANCHEZ and ERIC ALEJO;<br><br>　　*Plaintiffs*,<br>v.<br><br>LOS ANGELES DEPARTMENT OF TRANSPORTATION and CITY OF LOS ANGELES,<br><br>　　*Defendants*. | CASE NO: 2:20-cv-05044<br><br>**COMPLAINT** |

*(continued from previous page)*

Jennifer Lynch (SBN 240701)
jlynch@eff.org
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
Tel:   (415) 463-9333
Fax:   (415) 436-9993

Douglas E. Mirell (SBN 94169)
DMirell@ggfirm.com
Timothy J. Toohey (SBN 140117)
TToohey@ggfirm.com
Greenberg Glusker Fields Claman & Machtinger LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:   (310) 553-3610
Fax:         (310) 553-0687

# INTRODUCTION

1. Beginning in late 2017, communities across California witnessed a near-overnight invasion of motorized electric scooters on city sidewalks. Equipped with tiny motors, batteries, and the sleek insignia of their proprietor technology companies, they introduced a new dockless mode of transit for smartphone-equipped consumers as an alternative to cars, bicycles, and public transit. Similar to a car ride-share service, riders reserve and pay for scooter rentals through a smartphone app. At the end of a trip, the user leaves the scooter on the street, where it can be rented again.

2. Soon after scooters appeared, complaints targeting the scooter companies followed. Although dockless scooters represented a novel and potentially useful form of transit, they also cluttered city sidewalks, lacked safety features, and interfered with disabled access to city streets. The scooter companies themselves often did jurisdictions no favors, aggressively pushing back against attempts to regulate the vehicles.

3. As in other cities across the country, this was the story of scooters in Los Angeles. In an attempt to avoid the unpopular profusion of scooters filling the sidewalks, Defendants Los Angeles Department of Transportation and the City of Los Angeles (collectively "LADOT" or "Defendants") developed a far-reaching software tool that (they claim) is necessary to managing the right of way. Dubbed the Mobility Data Specification ("MDS"), this software interface, crafted in partnership with a private consultancy, forces operators of dockless vehicles to provide real-time and historical data about each vehicle and trip taken in Los Angeles, all as a condition of operating. Most importantly, the tool requires that scooter companies produce detailed trip data about every single scooter trip taken within city limits, including where each trip starts, the route it takes, and where it ends.

4. Although MDS does not record the identity of the rider directly, the

precision with which it captures riders' location information—often to within a few feet—likely allows riders to be identified. Knowing that a particular trip began at an office building and ended in front of a home, for example, makes the difficulty of identifying the individual rider as simple as knowing their home and work addresses. Given the large amount of public or otherwise accessible data about people's lives that exists, simply cross-referencing MDS data about a particular trip with any other dataset (including mere observation of a routinely-taken scooter trip) can reveal who took the trip.

5. Beyond identifying an individual rider, the locations where an individual's trip starts and ends can also reveal *why* that rider made the trip. Regular trips that start near a residence and end at an office reveal that a person living at the residence works at the office and takes a particular route to work. Periodic trips that begin at a high school and end in a family-planning clinic could reveal that a student is seeking reproductive health care. Even a single trip to a protest against police violence may result in a rider's name being revealed and her presence at the protest exposed against her wishes.

6. LADOT has never articulated an adequate or reasonable justification for the collection of such sensitive location information *en masse*. When mandated by the Los Angeles City Council to identify, by February 25, 2020, its reasons for collecting precise location data, LADOT failed to do so. Now, over three months after this deadline, LADOT has still not articulated an operationally specific need for this data. To date, it has offered only the most generic justifications for collecting precise location information, stating at one point that its goal is to "experiment" with riders' protected information when setting agency policy.

7. The Constitution prohibits LADOT from experimenting with the rights of its constituents. The Fourth Amendment strictly limits the warrantless collection of vehicular location information. As a Supreme Court majority recognized in *United States v. Jones*, "GPS monitoring generates a precise,

comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." 565 U.S. 400, 415 (2012) (J., Sotomayor, concurring); *id.* at 430 (J., Alito, concurring) (long-term capture of vehicle location information violates reasonable expectation of privacy). This is particularly true here, where the scale and breadth of that data collection has no conceivable relation to a targeted investigation of a particular individual. MDS collects precise location data associated with *every single rider* of scooters within the City, *every single time* they ride such a vehicle. And once MDS software is deployed, it gathers location data without any human involvement and at the maximum precision generated by the vehicles.

8. Plaintiffs ride electric scooters in the City of Los Angeles, using the vehicles to make trips from their homes to work, friends, businesses, and places of leisure. LADOT uses MDS to warrantlessly collect sensitive vehicle location data associated with each of Plaintiffs' trips, in violation of their right to be free from unreasonable searches and seizures in contravention of the United States and California Constitutions. The compelled production of Plaintiffs' location information also violates the California Electronic Communications Privacy Act ("CalECPA").

9. LADOT violates these rights irrespective of whether it collects data about Plaintiffs' movements in real-time or after a period of delay. The gathering of historical location information about individuals without sufficient justification violates the Constitution. *United States v. Carpenter*, 138 S. Ct. 2206, 2218 (2018) (comparing the greater harms of historical location tracking as opposed to manual real-time observation, and explaining that "[u]nlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when."). When that location data is highly precise (as the MDS data is), the risks with collecting historical location information are too great without a warrant.

10. Through this action, Plaintiffs seek, among other forms of relief, expungement of their location data from LADOT's servers and an injunction preventing MDS from collecting and storing precise location information *en masse*.

## JURISDICTION

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because it alleges violations of the United States Constitution enforceable through 42 U.S.C. § 1983, and under 28 U.S.C. § 1367 because it alleges violations of the California Constitution and the California Penal Code.

## VENUE

12. Venue is proper under 28 U.S.C. § 1391(a) because Defendants are residents of this district, 28 U.S.C. § 1391(b) because the events and actions giving rise to the claims herein occurred in this District, and 28 U.S.C. § 1391(c) because Defendants are subject to the court's personal jurisdiction in this District.

## PARTIES

13. Plaintiff Justin Sanchez is a resident of Los Angeles, and a customer of and rider of dockless vehicles offered by Lime, Bird, and Lyft. Mr. Sanchez has ridden scooters operated by these three providers within the City of Los Angeles while MDS has been in effect. Mr. Sanchez intends to continue riding these dockless vehicles within Los Angeles in the future.

14. Plaintiff Eric Alejo is a resident of Los Angeles, and a customer of and rider of dockless vehicles offered by Lyft, JUMP, Bird, and Lime. Mr. Alejo has ridden scooters operated by these four providers within the City of Los Angeles while MDS has been in effect. Mr. Alejo also intends to continue riding these dockless vehicles within Los Angeles in the future.

15. Defendant City of Los Angeles is a public entity, duly organized and existing under the laws of the State of California.

16. Defendant Los Angeles Department of Transportation is a government agency created by Los Angeles city ordinance. It advertises that its mission is "to lead transportation planning, project delivery, and operations in the City of Los Angeles." LADOT developed and operates the permitting program that licenses the operation of dockless vehicle providers within Los Angeles.

## STATEMENT OF FACTS

**I. DOCKLESS VEHICLES LAUNCH IN SOUTHERN CALIFORNIA IN 2017, AND ARE FORMALLY ALLOWED IN THE CITY OF LOS ANGELES BEGINNING IN MARCH 2019.**

17. Beginning in 2017, numerous private companies began dropping dockless vehicles, including motorized scooters and electric bicycles, on Los Angeles streets. These vehicles are owned and maintained by private companies, and individual customers can rent them via a smartphone application. These vehicles are "dockless" in that rides need not start from a fixed docking station, like a traditional municipal bicycle share. Instead, rides can begin and end wherever a vehicle is located, with a user employing only the provider's mobile application to terminate the rental. At that point, the application informs the rider of the cost of the ride, and charges the user accordingly.

18. The operators typically outfit the vehicles with rechargeable batteries, Global Positioning System ("GPS") trackers, and wireless connectivity to the internet. The vehicles broadcast precise GPS coordinates to the operator, which allows it to track rides and charge customers accordingly.

19. With the growing use of dockless vehicles in neighboring cities, the Los Angeles City Council passed an ordinance on September 28, 2018 compelling LADOT to implement a "Shared Mobility Device Pilot Program" establishing an application process for the approval of City-issued permits to operators of dockless bicycles, electric bicycles, motorized scooters, and electric scooters. The ordinance mandated that under the Pilot Program, "an operator of a shared mobility device

shall obtain a permit from the Department [of Transportation] and comply with all Department permit rules, regulations, indemnification, insurance and fee requirements."

20. In response, LADOT created the permitting program via an application and review process. In exchange for a license to operate a micromobility company within City limits, LADOT instructed operators to submit an application detailing their intended deployment in the City and agreeing to numerous regulatory requirements.[1] These requirements included otherwise standard insurance requirements, an agreement to an indemnification provision, limits on the total number of vehicles any individual operator could deploy within Los Angeles, agreements to place safety features like lights and reflectors on vehicles, requirements that operators ensure vehicles are appropriately parked and not blocking pedestrian rights of way, and incentives for operators to diversify the geographic distribution of their vehicles. Relevant here, the permitting application required operators agree to implement MDS's data collection protocols.

21. Once an operator applied for a permit, LADOT reviewed the application and awarded an operating permit to the applicant accordingly. Individual end users were not parties to the application agreement, despite their sensitive location data being critical to the process.

22. The original one-year pilot program launched in March 2019, and has been extended for six months through September 15, 2020. At the close of the now-eighteen-month pilot, LADOT plans to establish a one-year formal dockless mobility pilot program.

**II. DEFENDANTS UTILIZE THE MOBILITY DATA SPECIFICATION TO UNLAWFULLY COLLECT PRECISE MOVEMENT DATA.**

23. As a condition of securing a permit to operate in the City of Los

---

[1] LADOT's original permit application is available at https://files.acluwest.org/s/XATp4ErkW4WsSsT.

Angeles, LADOT requires mobility companies to implement MDS's data collection requirements. MDS contains two interrelated parts: 1) the data-collection standard, which specifies what information mobility providers must deliver to the governing jurisdiction, and 2) reference implementations in software code that both mobility providers and the governing jurisdiction can use to set up the information exchange. MDS ingests data directly from the transportation companies, enabling LADOT "to actively manage private mobility providers and the public right-of-way . . . through a shared data vocabulary and to communicate directly with product companies in real time using code."[2]

24.  The purpose of MDS is to accelerate information collection by cities and counties facing an increase in the volume of permitting associated with dockless scooters. According to the non-profit Open Mobility Foundation, the proprietor of MDS who took over its administration from LADOT, "the goals of MDS are to provide a standardized way for municipalities or other regulatory agencies to ingest, compare and analyze data from mobility service providers, and to give municipalities the ability to express regulation in machine-readable formats. . . . MDS is a key piece of digital infrastructure that supports the effective implementation of mobility policies in cities around the world." Instead of each city deciding for itself what information to collect and writing the necessary software, MDS encourages cities to adopt a single existing standard.

25.  MDS, once implemented by private dockless scooter companies, ingests a wide variety of data directly from the providers without any human input. The data includes the provider's name, a unique device identifier for the vehicle, the type of vehicle, the length of the trip, its starting point, end point, and the route the vehicle took on its trip. Relevant here is the route information requirement,

---

[2] "Mobility Data Specification: Information Briefing," Los Angeles Department of Transportation, https://ladot.io/wp-content/uploads/2018/12/What-is-MDS-Cities.pdf, Oct. 31, 2018.

which calls for granular trip data from the providers to LADOT about every ride taken within Los Angeles—including the starting point of the ride, the starting time of the ride, the end point for the ride, and the ending time of the ride. LADOT requires that start and end locations be provided in real-time, and the route that the trip took between those points provided after 24 hours.

26.     While MDS does not collect any information directly identifying the rider of a particular vehicle, the sensitivity of movement information makes it possible to identify individual riders anyway. Coupling a rider's precise trip data with information from just one other dataset—for instance, additional scooter rides that show a pattern of repeated trips to and from the same locations, public voting records from particular addresses, or even simple physical observation of a rider—can likely identify the individual who took the trip. In addition, it may reveal important information about the individual's residence, the identity of her employer, associates, or friends, the type of physicians she visits, or her favorite recreational activities. And when end points are sensitive locations—like therapists' offices, marijuana dispensaries, or Planned Parenthood clinics—those routes may reveal *why* she made that trip.

27.     In a time when protests are erupting around the country, the risk of identifying individuals based on physical observation takes on a new importance. Imagine a person who takes a scooter to a political protest, or even rides past and is captured by one of the many cameras used to document interaction between protesters and police. With the information LADOT ingests through MDS, that individual ride could be picked out of a haystack of data and handed over to the police, who would then know where the person ended their trip, where they started, and the precise route they took.

28.     The likelihood of identifying individuals based only on location information is not a hypothetical concern. A growing body of research has demonstrated that location datasets are easily susceptible to identification. "With

merged mobility datasets, this becomes even easier: An agent could potentially match users trajectories in anonymized data from one dataset, with deanonymized data in another, to unmask the anonymized data."[3] For instance, researchers have found that they could identify 50% of people from only two randomly chosen data points in a dataset that contained only time and location data.[4]

29. Identification of location data poses grave risks to individuals—particularly marginalized or justice-impacted members of the community. In addition to revealing sensitive information about people's lives, this information can exacerbate persistent forms of state violence and bias that target those at the fringes. This includes police encounters, immigration enforcement, homelessness sweeps, or enforcement of pre-trial release terms or probation conditions, to name a few. Past experience has also shown that individual location information in the hands of authorities can stoke racial and gender-based violence. When collected without adequate safeguards, location information often results in cases of domestic abuse and stalking, as a recent investigation of automatic license plate reader information in California revealed.[5]

---

[3] Rob Matheson, *The privacy risks of compiling mobility data: Merging different types of location-stamped data can make it easier to discern users' identities, even when the data is anonymized*, MIT News (Dec. 7, 2018), http://news.mit.edu/2018/privacy-risks-mobility-data-1207 (describing Daniel Kondor et al., "Towards matching user mobility traces in large-scale datasets," IEEE Transactions on Big Data (Sep. 24, 2018), *available at* http://senseable.mit.edu/papers/pdf/20180927_Kondor-etal_TowardsMatching_IEEE-BigData.pdf)).

[4] Yves-Alexandre de Montjoye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, 3 Nature Scientific Reports 1376 (2013), http://www.nature.com/articles/srep01376 (finding that "in a dataset where the location of an individual is specified hourly, and with a spatial resolution equal to that given by the carrier's antennas, four spatio-temporal points are enough to uniquely identify 95% of the individuals.").

[5] "Automated License Plate Readers: To Better Protect Individuals'' Privacy, Law Enforcement Must Increase Its Safeguards for the Data It Collects,"

(cont'd)

30. Despite the sensitivity of location data and the increasing legal protections individuals have over their location information, LADOT's MDS protocol demands maximally precise locations about individuals' trips. LADOT's technical consultants developed the program to collect as precise information as the vehicles generate. With the pilot program in full effect, LADOT captured GPS coordinates broadcast by scooters up to seven decimal places, an extraordinary level of accuracy even assuming a wide margin of error. For background, GPS coordinates are often expressed through decimal degrees via longitude and latitude coordinates. The more decimal places a GPS coordinate is measured in, the more precise the location it reveals is.[6] MDS compels vehicle operators to provide the coordinates of each vehicle in latitude and longitude to the maximum precision allowed by the vehicle, which can be up to seven decimal places. For reference, coordinates in seven decimal degrees are accurate to within 1.11 centimeters at the equator. In real-world conditions away from the equator, the accuracy with which the companies capture a vehicle's location depends on the scooter's hardware, the availability of over-the-air internet connectivity, and the physical conditions surrounding a vehicle that may impact GPS signal strength. Given advances in technology and widespread access to 4G (and, soon, 5G connectivity), the coordinates generated by dockless vehicles can accurately place them within a few dozen feet, indicating with confidence, for example, where on a city block a scooter is and the building or piece of city infrastructure nearest which it is parked.

31. Research has demonstrated that even truncating GPS coordinates of trips' origins and destinations by lopping off GPS decimal places does little to

---

California State Auditor (Feb. 20, 2020), https://www.auditor.ca.gov/pdfs/reports/2019-118.pdf, at 12–13 (discussing instance of gender-based assault resulting from license plate location information).

[6] For a helpful explanation of the math behind the precision of GPS locations, *see* "Decimal Degrees," WIKIPEDIA, https://en.wikipedia.org/wiki/Decimal_degrees (last visited June 3, 2020).

protect individuals' privacy. Such is the sensitivity of location data sets, which cannot reasonably be considered "anonymized" in any real sense when collected *en masse* and with the precision that MDS currently demands.

32. Given these facts, and upon information and belief, a simple analysis of MDS data will likely identify the precise trips taken by Plaintiffs in this case and where they live, work, shop, and frequent. Plaintiffs have never agreed to share their precise location data with LADOT, even though LADOT has used MDS to extract this data from the operators whose vehicles Plaintiffs rented.

### III. DEFENDANTS HAVE FAILED TO PROVIDE REASONABLE JUSTIFICATIONS FOR COMPELLING PRODUCTION OF LOCATION INFORMATION.

33. When LADOT launched its pilot MDS program, it did not identify with operational specificity how it intended to use the data ingested by MDS. Nor did it develop a data collection and retention program narrowly tailored to meet even the use cases it did identify. As a result, granular location information easily susceptible to identification is needlessly—and illegally—collected and at risk of being shared with third parties and targeted by other government actors.

34. According to LADOT, the purpose of MDS is multifaceted, and allows LADOT to "actively manage private companies who operate in our public space."[7] During the development of the pilot program, LADOT identified numerous overlapping and related benefits that mass location data may provide to the regulators, some more specific than others, but none that necessitated collecting all riders' granular and precise location information *en masse*.

35. To the contrary, LADOT leadership expressly identified the MDS pilot as a mechanism to "experiment" with this data collection project.[8] Put

---

[7] "LADOT | Putting Ideas into motion," https://ladot.io/ (embedding YouTube video entitled "The Future of Mobility – Mobility Data Specification").

[8] David Zipper, "Cities can see where you're taking that scooter," Slate, Apr.

(cont'd)

differently, LADOT has intentionally gathered sensitive and legally protected location information in an experimental posture with data concerning actual users in real time—unlawfully collecting data in order to determine *post hoc* how to exploit them to serve non-specific regulatory needs.

36. LADOT's dockless scooter pilot program fails to tailor its collection of individual location data to articulable use cases. Given the lack of specificity for its proposed use cases, it is difficult to identify potential alternatives to maintaining individual trip data, or to gauge the necessity of mass location data collection to achieve LADOT's regulatory ends.

37. To the contrary, LADOT has been exceptionally vague about how it intends to use this data, in part to allow the agency to experiment with exploiting the data *after* it is collected. Each of the articulated use cases LADOT has offered for its desire to collect *en masse* individual vehicle location data fails under scrutiny. For instance, the City Council mandated that LADOT's pilot program incentivize providers to diversify access to its vehicles. Addressing equity in regional distributions of vehicles by itself does not require individual, granular location data. For instance, collecting a vehicle's neighborhood-level locations at regular, but disparate, time intervals (*e.g.*, every two hours) will adequately inform regulators whether providers are distributing their vehicles equitably—without collecting individuals' trip data.

38. Even the few use cases LADOT has offered for why granular trip data is necessary do not require detailed vehicle telemetry data. For instance, even though MDS calls for acquiring GPS coordinates up to a maximum level of precision, current physical limitations on the accuracy of GPS broadcasts from

---

2, 2019, https://slate.com/business/2019/04/scooter-data-cities-mds-uber-lyft-los-angeles.html (quoting LADOT General Manager Seleta Reynolds, "When bikes and scooters showed up, they gave us a pretty interesting sandbox to start experimenting.")

vehicles make their coordinates too imprecise to determine whether scooters are appropriately parked adjacent to a curb versus inappropriately parked in the middle of a sidewalk a couple of feet away, another purpose LADOT has offered for why it needs individual users' trip information.

39. Even when the City Council instructed LADOT to articulate "specific regulatory purposes for the collection and use of each type of data required by MDS," LADOT simply did not comply. This request came in a Los Angeles City Council Motion passed on November 27, 2019, which required LADOT to, among other things, provide a report outlining the "specific regulatory purposes for the collection and use of each type of data required by MDS" by February 25, 2020.[9] To date, and more than three months after the deadline, LADOT has still not articulated those purposes in response to the request.

40. Importantly, LADOT lacks reasonable and justifiable uses for both real-time location information and historical location data—both of which present substantially similar violations of Plaintiffs' rights. This is in contrast to concerns raised by some of the micromobility providers, including JUMP. While JUMP has historically protested LADOT's requirement that it produce precise location information in real-time, including by filings its own lawsuit challenging MDS data collection by MDS, JUMP offered to produce that information to LADOT after a 24-hour delay.[10] According to JUMP, a 24-hour delay "significantly mitigate[s] the frightening risks of direct and constant government surveillance and possible interception of individual users."[11]

41. Perhaps most ominously, LADOT plans to extend the same model for

---

[9] Motion No. 19-1355, Intro. By David Ryu (Nov. 1, 2019), *available at* http://clkrep.lacity.org/onlinedocs/2019/19-1355_mot_11-01-2019.pdf.

[10] *Social Bicycles LLC d/b/a JUMP v. City of Los Angeles*, No. 2:20-cv-02746 (C.D. Cal. filed Mar. 24, 2020), ECF No. 1, at ¶ 11 (challenging MDS location collection from perspective of private scooter operator).

[11] *Id.*

real-time geolocation information collection that it uses for dockless vehicles to "all kinds of future transportation forms—from ride-hailing and car-sharing to delivery drones and autonomous vehicles."[12] Under LADOT's leadership, the use of MDS for dockless vehicles has expanded to over eighty cities, with more to come. While Plaintiffs do not challenge LADOT's need to regulate emerging technologies and transportation modalities, such regulation must not compromise its obligations to protect the civil rights of its constituents.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of the Fourth Amendment (42 U.S.C. § 1983)

### (All Plaintiffs Against All Defendants)

42. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

43. Defendants' deployment of MDS violates Plaintiffs' right to be free from unreasonable search and seizure, as protected by the Fourth Amendment to the United States Constitution.

44. Defendants' administrative scheme to collect Plaintiffs' granular vehicle and mobility location information constitutes a search under the Fourth Amendment, whether in real-time or historically. Defendants' collection of this data is unreasonable, unconnected to any legitimate government interest, and occurs without any opportunity for administrative or judicial review pre-collection.

45. Defendants' administrative scheme also unreasonably conditions Plaintiffs' ability to ride dockless vehicles upon the disgorgement of Plaintiffs' otherwise protected location information.

---

[12] Laura Bliss, *This City Was Sick of Tech Disruptors. So It Decided to Become One.*, CITYLAB, https://www.citylab.com/transportation/2020/02/los-angeles-transportation-data-mobility-scooter-mds-uber/606178/ (last visited June 7, 2020).

46.     Finally, Defendants' ongoing retention of Plaintiffs' precise location data concerning their movements constitutes a warrantless search under the Fourth Amendment, and is not reasonable or justified.

47.     Plaintiffs seek an injunction to compel Defendants to delete all precise and identifiable location data concerning their movements collected by Defendants via MDS. Plaintiffs also seek an injunction to end all prospective collection, storage, or maintenance of their precise location data via MDS.

48.     Plaintiffs also seek damages against Defendants arising out of their unconstitutional collection, storage, and maintenance of their location information.

## SECOND CLAIM

## Violation of Article 1, § 13 of the California Constitution

## (All Plaintiffs Against All Defendants)

49.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

50.     Defendants' deployment of MDS violates Plaintiffs' right to be free from unreasonable search and seizure, as protected by Article 1, Section 13 of the California Constitution.

51.     Defendants' administrative scheme to collect Plaintiffs' granular vehicle and mobility location information constitutes a search under the California Constitution. Defendants' collection of this data is unreasonable, unconnected to any legitimate government interest, and occurs without any opportunity for administrative or judicial review pre-collection.

52.     Defendants' administrative scheme also unreasonably conditions Plaintiffs' ability to ride dockless vehicles upon the disgorgement of Plaintiffs' otherwise protected location information, itself a violation of the California Constitution.

53.     Finally, Defendants' ongoing retention of Plaintiffs' precise location data concerning their movements constitutes a warrantless search under the

California Constitution, and is not reasonable or justified.

54. Plaintiffs seek an injunction to compel Defendants to delete all precise and identifiable location data concerning their movements collected by Defendants via MDS. Plaintiffs also seek an injunction to end all prospective collection, storage, or maintenance of their precise location data via MDS.

55. Plaintiffs also seek damages against Defendants arising out of their unconstitutional collection, storage, and maintenance of their location information.

## THIRD CLAIM

## Violation of the California Electronic Communications Privacy Act, Cal. Penal Code § 1546 et seq.

### (All Plaintiffs Against All Defendants)

56. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

57. Under the California Electronic Communications Privacy Act, a California government entity may only compel the production of electronic information through the execution of a probable-cause warrant or analogous order, or under a narrowly circumscribed set of exceptional circumstances. Cal. Penal Code § 1546.1(a), (d).

58. Location information gathered by MDS constitutes both "electronic communication information" and "electronic device information" under the terms of CalECPA, subjecting it to CalECPA's strict requirements for access and collection. *See* Cal. Penal Code § 1546(c)–(d), (g).

59. The mobility providers that operate dockless vehicles, including JUMP, Lyft, Lime, and others, constitute "service providers" within the terms of CalECPA, since they offer "electronic communication service[s]" that in part provide to riders "the ability to send or receive electronic communications" Defendants constitute "government entities" under the statute. Cal. Penal Code § 1546(e), (j).

60. Defendants' compulsory requirement that operators disclose Plaintiffs' location information violates Penal Code sections 1546.1(b) and 1546.1(c). Plaintiffs are therefore entitled to expungement of all location records collected by Defendants relating to them, pursuant to section 1546.4(c).

## **PRAYER FOR RELIEF**

61. Plaintiffs request the Court grant the following relief:

   a. Issue a declaration stating that Defendants' collection of precise location information concerning every ride taken by Plaintiffs violates the Fourth Amendment of the United States Constitution, Article 1, section 13 of the California Constitution, and CalECPA;

   b. Issue an injunction ordering Defendants to destroy all precise location records associated with Plaintiffs' rides;

   c. Issue an injunction ordering Defendants to stop the collection, storage, and preservation of Plaintiffs' precise location data via the MDS API;

   d. Issue an injunction prohibiting Defendants from requiring compliance with the MDS API's precise location collection requirement as a prerequisite for issuing LADOT's Dockless On-Demand Personal Mobility Permit;

   e. Award damages to Plaintiffs for violations of their federal and state constitutional rights;

   f. Award Plaintiffs their reasonable attorneys' fees and costs; and

   g. Grant any other relief that this Court may deem proper and just.

DATED: June 8, 2020                  Respectfully submitted,

                                     By: /s/ *Mohammad Tajsar*
                                          Mohammad Tajsar
                                          Counsel for Plaintiffs