Mohammad Tajsar (SBN 280152)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Jacob A. Snow (SBN 270988)
jsnow@aclunc.org
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Counsel for Plaintiffs*
*(continued on next page)*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN SANCHEZ and ERIC ALEJO; <br><br> *Plaintiffs*, <br><br> v. <br><br> LOS ANGELES DEPARTMENT OF TRANSPORTATION and CITY OF LOS ANGELES, <br><br> *Defendants*. | CASE NO: 2:20-cv-05044 <br><br> **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** <br><br> **Hearing** <br><br> Date: September 11, 2020 <br> Time: 9:30 a.m. <br> Location: Courtroom 8C <br> 350 W. 1st Street <br> Los Angeles, CA 90012 |

99901-10237/3845714.1

*(continued from previous page)*

Jennifer Lynch (SBN 240701)
jlynch@eff.org
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
Tel:    (415) 463-9333
Fax:   (415) 436-9993

Douglas E. Mirell (SBN 94169)
DMirell@ggfirm.com
Timothy J. Toohey (SBN 140117)
TToohey@ggfirm.com
Greenberg Glusker Fields Claman & Machtinger LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:   (310) 553-3610
Fax:          (310) 553-0687

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................. 1

BACKGROUND ................................................. 1

ANALYSIS ..................................................... 2

I.     PLAINTIFFS' COMPLAINT STATES A CONSTITUTIONAL
VIOLATION. .................................................. 2

    A.    LADOT's automated collection of Plaintiffs' precise location
data constitutes a search under the Fourth Amendment ..................... 2

          1.    Plaintiffs enjoy an expectation of privacy in GPS
coordinates revealing their vehicular movements and
locations .......................................................... 3

          2.    LADOT's insistence on the "anonymity" of MDS data
does not alter the search analysis................................ 7

          3.    Privacy policies set by scooter companies do not change
the constitutional nature of the search nor warrant
prematurely dismissing Plaintiffs' constitutional claims ........ 10

    B.    MDS's location collection is unreasonable and not tethered to
legitimate government purposes ........................................ 13

          1.    The nature and character of MDS's automated and
pervasive collection of location information is deeply
invasive ................................................... 14

          2.    LADOT fails to proffer a specific regulatory interest
furthered by collecting Plaintiffs' precise location and
movement data.......................................... 16

# TABLE OF CONTENTS
(continued)

**Page**

   3. LADOT fails to provide riders a meaningful opportunity for pre-compliance review or any mode of neutral arbitration .................................................................. 17

II. PLAINTIFFS MAY SEEK RELIEF UNDER CALECPA FOR LADOT'S UNLAWFUL LOCATION COLLECTION ............................. 20

  A. CalECPA applies to all government entities; it is not limited to the criminal context .......................................................... 21

  B. CalECPA gives Plaintiffs the right to seek relief in this Court for the unlawful collection of their location information ................. 23

III. PLAINTIFFS PROPERLY NAME LADOT AS A DEFENDANT ............ 24

CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Airbnb, Inc. v. City of New York,*
    373 F. Supp. 3d 467 (S.D.N.Y. 2019)................................................................15

*Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls,*
    536 U.S. 822 (2002)............................................................................13, 15

*Buliga v. New York City Taxi Limousine Comm'n,*
    No. 07 CIV. 6507 (DLC), 2007 WL 4547738 (S.D.N.Y. Dec. 21, 2007)..............19

*Byrd v. United States,*
    138 S. Ct. 1518 (2018).........................................................................11, 12

*Camara v. Mun. Court of City and Cnty. of San Francisco,*
    387 U.S. 523 (1967)...............................................................................3

*Carniol v. New York City Taxi & Limousine Comm'n,*
    975 N.Y.S.2d 842 (Sup. Ct. 2013) ............................................................19

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018).................................................................. *passim*

*Cassidy v. Chertoff,*
    471 F.3d 67 (2d Cir. 2006).....................................................................14

*Chandler v. Miller,*
    520 U.S. 305 (1997)..............................................................................16

*City of Los Angeles, Calif. v. Patel,*
    576 U.S. 409 (2015)..........................................................................18, 19

*City of San Jose v. Superior Court,*
    5 Cal. 4th 47 (1993) ..............................................................................23

*Dahlia v. Rodriguez,*
    735 F.3d 1060 (9th Cir. 2013) ..................................................................9

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ....................................................................9

*Doe v. City of San Diego,*
    No. 12-CV-0689-MMA DHB, 2013 WL 2338713 (S.D. Cal. May 28, 2013)........22

*F.T.C. v. Netscape Commc'ns Corp.,*
    196 F.R.D. 559 (N.D. Cal. 2000)..............................................................22

*Ferguson v. City of Charleston,*
    532 U.S. 67 (2001)................................................................................16

# TABLE OF AUTHORITIES

(continued)

**Page**

*Garcia v. Country Wide Fin. Corp.*,
No. 07-1161 VAP, 2008 WL 7842104 (C.D. Cal. Jan. 17, 2008) ..............................................9

*Hurth v. County of Los Angeles*,
No. 09-5423 SVW (PJWx), 2009 WL 10696491 (C.D. Cal. Oct. 28, 2009) .........................25

*Illinois v. Lidster*,
540 U.S. 419 (2004) ............................................................................................4

*In re Application of U.S. for Historical Cell Site Data*,
724 F.3d 600 (5th Cir. 2013) .............................................................................12

*In re Google Location History Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) .................................................................6

*Kizer v. Hanna*,
48 Cal. 3d 1 (1989) ..........................................................................................21

*Kyllo v. United States*,
533 U.S. 27 (2001) ..........................................................................................3, 8

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) .............................................................................8

*Lyall v. City of Los Angeles*,
807 F.3d 1178 (9th Cir. 2015) ...........................................................................4

*Marshall v. Barlow's, Inc.*,
436 U.S. 307 (1978) ..........................................................................................17

*McMorris v. Alioto*,
567 F.2d 897 (9th Cir. 1978) .............................................................................17

*Monell v. New York City Department of Social Services*,
436 U.S. 658 (1978) ..........................................................................................25

*Naperville Smart Meter Awareness v. City of Naperville*,
900 F.3d 521 (7th Cir. 2018) .........................................................................9, 12

*People v. Ross*,
221 Cal. App. 2d 443 (Ct. App. 1963) ..............................................................23

*Safaie v. City of Los Angeles*,
No. 19-3921 FMO, 2020 WL 2501450 (C.D. Cal. Mar. 23, 2020) .........................17

*Samson v. California*,
547 U.S. 843 (2006) ..........................................................................................13

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Sanchez v. County of San Diego*,
   464 F.3d 916 (9th Cir. 2006) ..............................................................................2

*Skinner v. Ry. Labor Executives' Ass'n*,
   489 U.S. 602 (1989)................................................................................12, 18

*Smith v. Maryland*,
   442 U.S. 735 (1979)..........................................................................11, 12, 13

*Tarabochia v. Adkins*,
   766 F.3d 1115 (9th Cir. 2014) ..........................................................................15

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)..........................................................................................23

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. 15-1343 DOC, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ...........................9

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989)..........................................................................................6

*United States v. Bailey*,
   628 F.2d 938 (6th Cir. 1980) (Keith, J., concurring) ..........................................3

*United States v. Chavez*,
   No. 15-CR-00285-LHK, 2019 WL 1003357 (N.D. Cal. Mar. 1, 2019) ...................6

*United States v. Diggs*,
   385 F. Supp. 3d 648 (N.D. Ill. 2019) ...............................................................6

*United States v. Ellis*,
   270 F. Supp. 3d 1134 (N.D. Cal. 2017) ............................................................6

*United States v. Grey*,
   959 F.3d 1166 (9th Cir. 2020) ..........................................................................17

*United States v. Kama*,
   394 F.3d 1236 (9th Cir. 2005) ..........................................................................25

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) (en banc) ............................................................11

*United States v. Owens*,
   782 F.2d 146 (10th Cir. 1986) ..........................................................................11

*United States v. Thomas*,
   447 F.3d 1191 (9th Cir. 2006) ..........................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Yang,*
   958 F.3d 851 (9th Cir. 2020) ....................................................................12

*Willner v. Thornburgh,*
   928 F.2d 1185 (D.C. Cir. 1991)...............................................................15

**STATUTES**

15 U.S.C. § 56(b) ........................................................................................22

18 U.S.C. § 2701 *et seq.* (Electronic Communications Privacy Act (ECPA)) ...................... *passim*

42 U.S.C. § 1983 .........................................................................................25

Cal. Elec. Code § 14026 ..............................................................................21

Cal. Gov. Code § 8557..................................................................................21

Cal. Gov. Code § 8698..................................................................................21

Cal. Lab. Code § 1721 .................................................................................22

Cal. Penal Code §1546 *et seq.* (California Electronic Communications Privacy
   Act) ...................................................................................................... *passim*

Cal. Pub. Util. Code  §1402 .........................................................................21

Cal. Penal Code  § 690.............................................................................21, 23

Cal. Penal Code §1546.4(b) .........................................................................24

**OTHER AUTHORITIES**

California Constitution....................................................................................2

Federal Rule of Evidence 201(b) ...................................................................8

Federal Rule of Civil Procedure 12(b)(6) ...................................................8, 9

United States Constitution Fourth Amendment ........................................ *passim*

# INTRODUCTION

This case concerns the government's automated collection of detailed and accurate GPS coordinates of all shared scooter rides, taken by all scooter riders, anywhere in the City of Los Angeles. The City's radical departure from ordinary transportation regulation constitutes a violation of settled expectations of privacy, is unjustified by any legitimate planning goals, and is unreasonable on its face. It also violates California law specifically limiting the overcollection of electronic information by government agencies throughout the state. The City of Los Angeles and the Los Angeles Department of Transportation (collectively "LADOT") dispute this, and seek premature dismissal of the action. In its filing, LADOT ignores controlling precedent that establishes the invasiveness of automated location and movement tracking. It also ignores Plaintiffs' allegations demonstrating that such precise data collection serves no reasonable government interest, and is, in any event, not tailored to protect scooter riders from the threats associated with government ingestion of such sensitive information. Finally, LADOT fails to address the plain language of the California Electronic Communications Privacy Act ("CalECPA"), which forecloses this data-collection scheme and provides Plaintiffs a state law remedy in a civil court.

# BACKGROUND

Starting in 2019, LADOT began compelling shared scooter providers to produce detailed real-time and historical information about all rides taken by scooter riders in Los Angeles through a system called the "Mobility Data Specification" ("MDS"). Compl. ¶¶ 20, 23–25. That detailed information includes the precise locations where riders start and end their trips, as well as the route they take along the way—all in real-time or near real-time. *Id.* ¶ 25. The information collected by MDS has the potential both to identify riders and to reveal intensely private information about their movements, interactions, home and office locations, health, and political activities. *Id.* ¶¶ 26–29.

1    Plaintiffs Justin Sanchez and Eric Alejo are residents of Los Angeles, and

2  customers and riders of dockless scooter providers in Los Angeles. *Id.* ¶¶ 13–14.

3  They have ridden scooters within the City of Los Angeles while MDS has been in

4  effect, including on trips to and from their residences and workplaces. *Id.* ¶¶ 8, 13–

5  14. LADOT has collected and stored information associated with Plaintiffs through

6  the MDS program, including the precise trips they have taken. *Id.* ¶ 32.

7    Plaintiffs bring three claims for relief. First, they claim that LADOT's MDS

8  program violates their rights under the Fourth Amendment to the United States

9  Constitution. *Id.* ¶¶ 42–48. Second, they claim that the MDS program violates

10  similar rights against search and seizure under Article I, Section 13, of the

11  California Constitution. *Id.* ¶¶ 49–55. Third, Plaintiffs allege that MDS compels

12  the production of their electronic information in violation of CalECPA. *Id.* ¶¶ 56–

13  60. LADOT moved to dismiss all three claims. *See* Dkt. 18 ("Mot.").

14                                    **ANALYSIS**

15  **I.    PLAINTIFFS' COMPLAINT STATES A CONSTITUTIONAL**

16  **VIOLATION.[1]**

17    **A.    LADOT's automated collection of Plaintiffs' precise location data**

18    **constitutes a search under the Fourth Amendment.**

19    The Fourth Amendment's demand that individuals "be secure in their

20  persons, houses, papers, and effects, against unreasonable searches and seizures"

21  now firmly covers both location information and movement information from

22  government collection and exploitation. *See* U.S. Const. amend. IV. The "basic

23  purpose of this Amendment . . . is to safeguard the privacy and security of

24

25    [1] As the relevant search and seizure rules of both the Fourth Amendment and
   Article I, Section 13, of the California Constitution are functionally coterminous,
26  *Sanchez v. County of San Diego,* 464 F.3d 916, 928–29 (9th Cir. 2006) ("[T]he
   right to be free from unreasonable searches under [Article I, Section 13] parallels
27  the Fourth Amendment inquiry."), Plaintiffs address them together under the
   heading of the Fourth Amendment.
28

1   individuals against arbitrary invasions by governmental officials." *Camara v. Mun.*
2   *Court of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). "[A] Fourth
3   Amendment search occurs when the government violates a subjective expectation
4   of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S.
5   27, 33 (2001). MDS's automated GPS collection scheme constitutes a search
6   because it gathers precise GPS coordinates reasonably traceable to individual
7   scooter riders that reveal their movements and the locations where they live, work,
8   and play. This is true regardless of the purported "anonymity" of the records, and
9   irrespective of the privacy policies maintained by the private scooter operators.

10          **1.**      ***Plaintiffs enjoy an expectation of privacy in GPS coordinates***
11                  ***revealing their vehicular movements and locations.***

12          MDS's location gathering scheme works two related, but independent,
13   invasions of Plaintiffs' settled privacy expectations: the privacy of their vehicular
14   movements, and the privacy of their locations. First, the Fourth Amendment has
15   long been held to protect individuals' expectations of privacy in their movements.
16   *See, e.g.*, *United States v. Bailey*, 628 F.2d 938, 949 (6th Cir. 1980) (Keith, J.,
17   concurring) (citing cases showing that "privacy of movement itself is deserving of
18   Fourth Amendment protections"). In *United States v. Jones*, five Justices extended
19   this principle to GPS monitoring of a vehicle on a public road. 565 U.S. 400
20   (2012). Relevant here, five Justices agreed that continuous GPS monitoring of a
21   vehicle impinges upon expectations of privacy and therefore constitutes a search
22   under the Fourth Amendment. *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring);
23   *id.* at 430 (Alito, J., concurring in the judgment) (long-term collection of vehicle's
24   GPS coordinates violates reasonable expectation of privacy). Relevant here, these
25   concurring Justices reasoned that the practical protections afforded by the
26   resource-intensive task of physical observations in the pre-digital age sufficiently
27   protected individuals' privacy in ways that continuous GPS tracking have rendered
28   inadequate. *Id.* at 429 (Alito, J., concurring) ("In the pre-computer age, the greatest

protections of privacy were neither constitutional nor statutory, but practical."); *id.* at 415–16 (Sotomayor, J., concurring) ("GPS monitoring . . . evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.' *Illinois v. Lidster*, 540 U.S. 419, 426 (2004).").

The analysis in *Jones* applies to the constitutionality of LADOT's system of mass automated GPS collection of scooter rides. As personal vehicles, MDS's scooter tracking regime bears all the hallmarks of continuous monitoring that animated the concurring Justices' concerns about the tracking device placed in *Jones*. First, MDS collects scooter movement data with a level of precision far greater than the device used 15 years ago in *Jones*. *Compare* Compl. ¶ 30 (accuracy of MDS collection ranges from a few centimeters to a few dozen feet) to *Jones*, 565 U.S. at 403 (tracking device accurate within 50 to 100 feet). Second, MDS employs software code that automatically ingests location information in real time, on a continuous basis, in perpetuity, and maintains a large historical record of them—a level of invasion far greater than the 28 days' worth of individual rides at issue in *Jones*. Compl. ¶ 25. Third, the precision of MDS location data threatens to create precisely the same "comprehensive record" about individuals' habits as that which Justice Sotomayor warned about in *Jones*. *Id.* at 415 (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."); *see* Compl. ¶¶ 26–29 (describing sensitivity of location data). Since scooter riders enjoy exclusive possessory interests in the scooters when they rent them, the collection of their precise movement information violates a reasonable expectation of privacy. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1187 & n.9 (9th Cir. 2015).

Beyond its concern with an individual's movement, the Fourth Amendment independently protects personal location information from unnecessary collection by the government. Controlling here is the Supreme Court's recent decision in

1   *Carpenter v. United States*, 138 S. Ct. 2206 (2018). *Carpenter* invalidated the

2   warrantless collection of historical third-party cell site location information

3   ("CSLI"), and rejected the application of the third-party doctrine to such

4   collection.[2] The *Carpenter* Court held that the FBI violated the Fourth Amendment

5   when, without a warrant based on probable cause, it requested five months of an

6   individual's historical CSLI from one wireless carrier and seven days of historical

7   CSLI from another. Building upon the concurrences in *Jones*, it reasoned that the

8   invasiveness of location information collected—even when individuals are in a

9   public space—violates their expectations of privacy. "As with GPS information,

10  the time-stamped data provides an intimate window into a person's life, revealing

11  not only his particular movements, but through them his 'familial, political,

12  professional, religious, and sexual associations.'" *Id.* at 2217 (quoting *Jones*, 565

13  U.S. at 415 (Sotomayor, J., concurring)). This was true even though CSLI tracking

14  is far less precise than GPS coordinates. *Id.* at 2219.

15      Like mobile phones, personal scooters operate as appendages of a person, at

16  least during the pendency of a ride. *Carpenter*, 138 S. Ct. at 2216 (describing both

17  vehicle location and cell phone location as "detailed, encyclopedic, and effortlessly

18  compiled"). And like cellular location tracking in *Carpenter*, automated vehicle

19  location tracking here erodes expectations of privacy further because it "is

20  remarkably easy, cheap, and efficient compared to traditional investigative tools."

21  *Id.* at 2217–18. The ease with which LADOT collects and stores detailed GPS

22  records through automated software code makes the extraction, retention, and

23  sharing of information to third parties similarly effortless. Compl. ¶¶ 23–25

24

25      [2] CSLI refers to the geographic segments created by the mesh of cellular
    radio antennas that provide cellular coverage in particular location segments.
26  *Carpenter*, 138 S. Ct. at 2211, 2219. When cellular phones connect to a network,
    the wireless carrier generates a time-stamped record of the location segment to
27  which an individual cell phone connected. *Id.* These segments are much less
    precise than the GPS coordinates at issue here. *Id.*
28

1  (describing MDS's automated location collection scheme); *see U.S. Dep't of*

2  *Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764 (1989)

3  ("Plainly there is a vast difference between the public records that might be found

4  after a diligent search of [various third parties' records] and a computerized

5  summary located in a single clearinghouse of information."); *In re Google*

6  *Location History Litig.*, 428 F. Supp. 3d 185, 198 (N.D. Cal. 2019) (distinguishing

7  intrusive "automatic" search of "*all* of Plaintiffs movements" as categorically more

8  intrusive than collection of "only specific movements or locations").

9        MDS's data collection scheme gathers and retains both real-time *and*

10 historical location and movement information, further deepening its intrusion upon

11 Plaintiffs' expectations of privacy. *See* Compl. ¶ 25 (describing real-time and near

12 real-time elements of MDS's location collection). "While the law enforcement

13 tactic employed in *Jones*—attaching a GPS tracking device to a vehicle—required

14 the police to know in advance that they want to follow a particular individual, the

15 tactic employed here—accessing a historical database of GPS information—means

16 that whoever the suspect turns out to be, he has effectively been tailed for the

17 entire period covered by the database." *United States v. Diggs*, 385 F. Supp. 3d

18 648, 652 (N.D. Ill. 2019) (quoting *Carpenter*, 138 S. Ct. at 2218; internal

19 quotations omitted); *see United States v. Chavez*, No. 15-CR-00285-LHK, 2019

20 WL 1003357, at *11 (N.D. Cal. Mar. 1, 2019) (discussing real-time location

21 tracking as opposed to historical data collection); *United States v. Ellis*, 270 F.

22 Supp. 3d 1134, 1145–46 (N.D. Cal. 2017) (same). By targeting *every* scooter rider

23 as they ride, and maintaining information about *every ride* in perpetuity, MDS

24 undoubtedly effectuates a search under *Carpenter* and *Jones.*

25       This conclusion accords with the Supreme Court's instruction to "assure

26 preservation of that degree of privacy against government that existed when the

27 Fourth Amendment was adopted." *Carpenter*, 138 S. Ct. at 2214 (quoting *Kyllo*,

28 533 U.S. at 34); *Jones*, 565 U.S. at 406 (same quote) (majority opinion) & 420

1   (same quote) (Alito, J., concurring). And that degree of privacy surely prevented

2   governmental monitoring of every vehicle ride, regardless of the length of each

3   trip. After all, at the time of the Fourth Amendment's adoption, the government

4   could not instantaneously track every rented horse and carriage on a public street,

5   nor call up a historical record of those movements over time. Nor did the

6   expectation of privacy held by the people of that era allow for the government to

7   follow their horse or carriage everywhere, at all times, on every trip, even if a

8   constable could permissibly tail a particular carriage for a short period of time.

9         **2.      *LADOT's insistence on the "anonymity" of MDS data does***

10                      ***not alter the search analysis.***

11        In seeking dismissal of Plaintiffs' search claims, LADOT mischaracterizes

12   MDS data as "anonymized" and argues that it therefore raises no Fourth

13   Amendment concerns. Mot. at 11. This is both wrong on the facts as alleged, and

14   irrelevant to the legal question.

15        As a threshold matter, the extent to which MDS's location data includes

16   other explicit information such as the names of individual riders is irrelevant to

17   whether the collection of precise historical and real-time location coordinates

18   constitutes a search. The degree to which exact movement or location

19   information—indeed, *any* detailed private dataset about people—can be linked

20   directly or probabilistically to an individual is a function of the size and precision

21   of the dataset itself, the additional information available to LADOT to identify

22   individual riders, and the resources—in this case, merely time—LADOT or

23   another entity wishes to expend on identification.

24        Plaintiffs' Complaint alleges that the greater precision of movement and

25   location data, the easier the government can identify with confidence specific

26   individuals within the dataset. Compl. ¶¶ 26–28 (citing relevant academic and

27   industry research on privacy and data science). Given the exact coordinates that

28   MDS collects, LADOT (or any third party that LADOT shares data with) needs to

expend relatively few resources to identify Plaintiffs' trips within MDS's tranche of data, particularly because they ride scooters to and from locations that can be easily traced to them (*e.g.*, their homes and workplaces, *see* Compl. ¶ 8). Whether a City entity—be it LADOT or, for instance, the Los Angeles Police Department— utilizes MDS data to identify Plaintiffs or any other rider is irrelevant to whether the Fourth Amendment limits its collection in the first instance.[3]

For this reason, the *Carpenter* Court discussed the danger inherent in how the "Government *could*, in combination with other information, deduce a detailed log of Carpenter's movements" in a fashion that violates expectations of privacy. *Carpenter*, 138 S. Ct. at 2218 (emphasis added); *see Kyllo*, 533 U.S. at 38 (recognizing that "there is no necessary connection between the sophistication of the surveillance equipment and the 'intimacy' of the details that it observes—

---

[3] Relying on extrinsic evidence, LADOT claims that its internal policies prohibit sharing raw trip data with law enforcement. Mot. at 4–5 (citing Dkt. 19-7, "Data Protection Principles"). As stated more fully in Plaintiffs' Response to LADOT's Request for Judicial Notice, Plaintiffs oppose consideration of the *contents* of documents not relied upon in their Complaint. *See* Dkt. 24. "[A] district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Second, Plaintiffs dispute what the Principles mean, how they are implemented, and whether they provide assurances against the unreasonable collection of sensitive information concerning Plaintiffs. *Id.* at 689 (Federal Rule of Evidence 201(b) prevents a court from taking "judicial notice of a fact that is subject to reasonable dispute"). Even if considered, the Principles are of no Fourth Amendment consequence. Recent history demonstrates that assurances municipalities make regarding limiting law enforcement access to individuals' data are often circumvented or ignored. *See, e.g.*, Jesse Marx, "Smart Streetlights Are Now Exclusively a Tool for Police," VOICE OF SAN DIEGO (July 20, 2020), https://www.voiceofsandiego.org/topics/public-safety/smart-streetlights-are-now-exclusively-a-tool-for-police/; Laura Wenus, "S.F. Police Accessed Private Cameras to Surveil Protesters, Digital Privacy Group Reveals," SAN FRANCISCO PUBLIC PRESS (July 28, 2020), https://sfpublicpress.org/sf-police-accessed-private-cameras-to-surveil-protesters-digital-privacy-group-reveals/. The Fourth Amendment question concerns the *collection* of sensitive information, not what municipalities publicly commit to doing with that information post-collection.

which means that one cannot say (and the police cannot be assured) that use of the relatively crude equipment at issue here will always be lawful."); *Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 526 (7th Cir. 2018) (holding that compelling use of "smart" electricity meters in homes constitutes a search even though "observers of smart-meter data must make some inferences to conclude, for instance, that an occupant is showering, or eating, or sleeping").

    In any event, LADOT's attempt to dismiss Plaintiffs' search claims as a matter of law is premature. The question whether MDS data can be reasonably or confidently associated with individual riders raises a factual question that must be decided in Plaintiffs' favor at this stage. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013) ("our task is not to resolve any factual dispute" regarding disposition of a Rule 12(b)(6) motion); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("We accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party."). Assessing this question requires determining the precision of MDS data, analyzing the habits of scooter riders, and conducting a probabilistic, scientific inquiry into the identifiability of precise movement information. Plaintiffs plausibly allege, based upon citations to existing literature, that associating location and scooter movement data with individuals is relatively simple—an allegation the Court must credit at this stage of the proceeding. Compl. ¶¶ 31–32; *Cf. Garcia v. Country Wide Fin. Corp.*, No. 07-1161 VAP (JCRx), 2008 WL 7842104, at *6 (C.D. Cal. Jan. 17, 2008) (plaintiff "is not required at the pleading stage to produce statistical evidence proving a disparate impact"); *Turocy v. El Pollo Loco Holdings, Inc.*, No. 15-1343 DOC (KESx), 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017) (statistical dispute concerning whether certain information was misleading in securities fraud action cannot be decided on motion to dismiss).

3. ***Privacy policies set by scooter companies do not change the constitutional nature of the search nor warrant prematurely dismissing Plaintiffs' constitutional claims.***

LADOT's Motion makes much of the scooter operators' privacy policies, claiming that varying language contained within them constitute "agreements" with Plaintiffs that vitiate whatever expectations of privacy Plaintiffs hold in their location and movements. In raising this argument, LADOT makes three errors: it prematurely introduces disputed extrinsic evidence at the motion-to-dismiss stage; it ignores precedent and principles from cases limiting the legal impact of privacy policies on expectations of privacy; and it misconstrues the applicability of the third-party doctrine to location collection facilitated by joint private-public action.

First, LADOT inappropriately relies on extraneous evidence to seek dismissal, when Plaintiffs' plausible allegations demonstrate that neither they nor the scooter operators waived Plaintiffs' expectations of privacy. In support of its Motion, LADOT seeks judicial notice of various privacy policies of scooter companies that it purports indicate Plaintiffs' "agreement" to disclose their location data to LADOT. Mot. at 12–14. This is inappropriate, because Plaintiffs dispute that they *in fact* voluntarily and knowingly disclaimed their expectations of privacy via these privacy policies, and their Complaint does not rely upon or reference these policies. *See* Part I.A.2 n.3 *supra* & Dkt. 24 (opposing LADOT's Request for Judicial Notice).

Second, LADOT's argument fails as a matter of law. It ignores precedent rejecting the third-party doctrine for intrusions upon individual's locational privacy rights, and decisions casting doubt on whether privacy notices can waive individuals' deeply held expectations of privacy as against government intrusion. For one, *Carpenter* explicitly declined to extend the third-party doctrine to location collection in a context where the proper functioning of an essential service (there, operation of a mobile telephone) necessitated disclosure to a third party.

*Carpenter*, 138 S. Ct. at 2220 (noting that "a cell phone logs a cell-site record by dint of its operation, without . . . [a] way to avoid leaving behind a trail of location data. As a result, in no meaningful sense does the user voluntarily 'assume the risk' of turning over a comprehensive dossier of his physical movements."; *quoting Smith v. Maryland*, 442 U.S. 735, 745 (1979)). Renting a shared scooter requires an individual disclose her location and movement information to the company to rent a particular scooter and be assessed a fee for its use. A rider thus no more voluntarily discloses location information to a scooter company than does a cell phone user to a mobile telephone provider.

Further, privacy policies do not make enforceable contracts, and are not designed to bind consumers. For one, they are rarely read or understood by consumers. *See United States v. Nosal*, 676 F.3d 854, 861 (9th Cir. 2012) (en banc) ("Our access to . . . remote computers is governed by a series of private agreements and policies that most people are only dimly aware of and virtually no one reads or understands."); "FTC Staff Issues Privacy Report, Offers Framework for Consumers, Businesses, and Policymakers," Fed. Trade Comm'n (Dec. 1, 2010), http://bit.ly/ftcstaffissues (noting that the "notice-and-choice model, as implemented, has led to long, incomprehensible privacy policies that consumers typically do not read, let alone understand"). In any event, the Supreme Court recently rejected the argument that Fourth Amendment rights can be determined by private form contracts. In *Byrd v. United States*, 138 S. Ct. 1518 (2018), the Court held that drivers have a reasonable expectation of privacy in a rental car even when they drive the car in violation of the rental agreement. *Id.* at 1529 (rental agreements, like terms of service or privacy policies, "concern risk allocation between private parties. . . . But that risk allocation has little to do with whether one would have a reasonable expectation of privacy in the rental car if, for example, he or she otherwise has lawful possession of and control over the car.").

*Byrd* follows a line of cases where courts have declined to find private

contracts dispositive of individuals' expectations of privacy. In *United States v. Thomas*, for instance, the Ninth Circuit held that the "technical violation of a leasing contract" alone is insufficient to vitiate an unauthorized renter's legitimate expectation of privacy in a rental car. 447 F.3d 1191, 1198 (9th Cir. 2006); *cf. United States v. Yang*, 958 F.3d 851 (9th Cir. 2020).[4] And in *United States v. Owens*, the Tenth Circuit did not let a motel's private terms govern the lodger's expectation of privacy, noting, "[a]ll motel guests cannot be expected to be familiar with the detailed internal policies and bookkeeping procedures of the inns where they lodge." 782 F.2d 146, 150 (10th Cir. 1986). This principle aligns with the Supreme Court's caution against allowing individual companies' privacy policies to "make a crazy quilt of the Fourth Amendment." *Smith*, 442 U.S. at 745.

Third, LADOT ignores its own role in compelling the disclosure of Plaintiffs' data, recasting its data-sharing mandate as a voluntary bargain entered into between scooter riders and scooter operators. Mot. at 11. Yet it is precisely LADOT that forces operators to provide Plaintiffs' location data, rather than exploiting an already existing tranche of locations that Plaintiffs have voluntarily provided to public agencies. Plaintiffs' "choice to share data imposed by fiat is no choice at all." *Naperville Smart Meter Awareness*, 900 F.3d at 527. Real-time tracking is quintessentially a case of the government "requiring a third party to collect" information, *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 610 (5th Cir. 2013), which has always constituted a Fourth Amendment search. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) ("[T]he [Fourth] Amendment protects against such intrusions if the private party acted as

---

[4] Although the court in *Yang* held that the defendant did not have a reasonable expectation of privacy in a rental car past the expiration of the rental agreement, it reaffirmed that mere technical violation of the agreement alone was insufficient to nullify the defendant's expectation of privacy. 958 F.3d at 861. Moreover, *Yang* was arguably wrongly decided considering the Supreme Court's decision in *Byrd*.

1    an instrument or agent of the Government."). For these reasons, LADOT errs in

2    placing any weight upon the privacy policies that scooter operators force their

3    customers to agree to—policies that, in any event, are not bilateral agreements and,

4    as such, may only be relied upon and enforced by scooter users rather than scooter

5    operators.[5]

6        **B.    MDS's location collection is unreasonable and not tethered to**

7              **legitimate government purposes.**

8        Having established that the collection of precise movement and location

9    records constitutes a search, the Court must now "examin[e] the totality of the

10   circumstances to determine whether [the] search is reasonable within the meaning

11   of the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 848 (2006)

12   (internal quotation marks omitted). The reasonableness of administrative or special

13   needs searches requires balancing (1) "the nature of the privacy interest allegedly

14   compromised" by the search, (2) "the character of the intrusion imposed" by the

15   Government, and (3) "the nature and immediacy of the government's concerns and

16   the efficacy of the [search] in meeting them." *See Bd. of Educ. of Indep. Sch. Dist.*

17   *No. 92 v. Earls*, 536 U.S. 822, 830–34 (2002).

18       A review of the *Earls* factors reveals that MDS's location gathering mandate

19   is unreasonable. First, collection of precise location and movement information *en*

20   *masse* is uniquely intrusive of Plaintiffs' expectations of privacy, and occurs

21   without any meaningful mitigation. Second, Plaintiffs plausibly allege that

22   LADOT possesses no meaningful justification for the collection of precise location

23

24       [5] The scooter companies themselves vigorously protested the use of MDS to
25   collect precise location records from them, both in advocacy and in litigation. *See,*
     *e.g.*, Compl. ¶ 40. LADOT forcing the companies to notify their riders about
26   location disclosure, over the companies' objections, cannot reasonably be
     construed as a voluntary agreement between the companies and riders. *Cf. Smith*,
27   442 U.S. at 740 n.5 (the government may not destroy an otherwise reasonable
28   expectation of privacy by putting the public on notice that it will do so).

information, let alone a reasonable one. Third, even if LADOT proffered a legitimate justification, it fails to provide a meaningful opportunity for pre-compliance review or any kind of neutral arbitration.

### 1. *The nature and character of MDS's automated and pervasive collection of location information is deeply invasive.*

As explained in Part I.A above, MDS's deployment of an "easy, cheap, and efficient" GPS tracking regime invades the sacrosanct privacy interests Plaintiffs have over their movement and location information. *Carpenter*, 138 S. Ct. at 2217–18. The strength of this interest supports Plaintiffs' position.

The character of MDS's intrusion into these privacy interests is likewise deeply invasive. When considering whether a search is minimally or substantially intrusive, courts evaluate a variety of factors, including, *inter alia*, "the duration of the search or stop, the manner in which government agents determine which individual to search, the notice given to individuals that they are subject to search and the opportunity to avoid the search . . . as well as the methods employed in the search." *Cassidy v. Chertoff*, 471 F.3d 67, 78–79 (2d Cir. 2006) (collecting Supreme Court precedent; internal citations omitted). None of these factors inure to LADOT's benefit. MDS compels the collection and retention of *all* trip data from *every* vehicle operator on a continuous, automated basis—irrespective of who the rider is, without any notifications, and with no way for riders to avoid the collection or opt out of the scheme. Compl. ¶ ¶ 25, 30.[6] It is therefore neither "limited in scope, relevant in purpose, [nor] specific in directive." *See v. City of*

---

[6] LADOT's discussion of the City of Los Angeles' general authority to create a data collection and regulatory scheme is therefore irrelevant to the precise Fourth Amendment question before the Court, which concerns a subset of LADOT's scooter permitting program that demands collection of maximally precise location records. *See* Mot. 5–7. If the GPS collection mandate did not exist, or was significantly altered to preclude association with individual riders, the Fourth Amendment analysis changes significantly.

*Seattle*, 387 U.S. 541, 544 (1967); *see Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 494 (S.D.N.Y. 2019) (continuous, monthly short-term rental registries "cannot be credibly described as 'limited in scope'"); *Willner v. Thornburgh*, 928 F.2d 1185, 1190 (D.C. Cir. 1991) (whether the person had "notice of an impending intrusion" and had a "large measure of control over whether he or she will be subject to" the search discussed as mitigating factors in the reasonableness analysis).

LADOT's reference to extrinsic statements made in an outside LADOT document called the "Data Protection Principles" does not change this analysis. Not only is consideration of the Principles inappropriate at the motion to dismiss stage and inappropriate as subject of judicial notice, *see* Part I.A.2 n.3 *supra*, the document on its face fails to provide the reasonable protections necessary to dull the impact of MDS's invasive search scheme. It states LADOT will engage in "data minimization" practices "where possible," without making such a commitment categorically and without specifying any methods for minimization. *See* Dkt. 19-7 at 124. Further, the document's characterization of GPS data as "vehicle data," as opposed to "individual data," *id.* at 123, is belied by the fact that the collected data pertains to individual *rides*, not individual *vehicles*. The Principles do little to mitigate the prospect that Plaintiffs' precise location and movement data will be collected or abused, since they do not "provide *specific* limitations on the manner and place of the search so as to limit the possibility of abuse." *Tarabochia v. Adkins*, 766 F.3d 1115, 1122 (9th Cir. 2014) (emphasis added); *see Earls*, 536 U.S. at 852 (Ginsburg, J., dissenting) ("There is a difference between imperfect tailoring and no tailoring at all."). For these reasons, the intrusiveness of the search and the nature of the information collected weigh heavily against LADOT.

1    2.    *LADOT fails to proffer a specific regulatory interest furthered*
2          *by collecting Plaintiffs' precise location and movement data.*

3    On the other side of the ledger, LADOT's Motion fails to articulate a

4    reasonable or rational basis for collecting Plaintiffs' precise location and

5    movement data. Plaintiffs allege that while LADOT published a top-line message

6    about using MDS to "[a]ctively manage private companies who operate in our

7    public space," it failed to articulate specific purposes for why MDS must collect

8    precise, granular location data. Compl. ¶ 34. LADOT's Motion does not address

9    these allegations, and does not offer any justification beyond a conclusory

10   statement that the scooter permitting application, and compliance with MDS,

11   "promot[es] public safety and ensur[es] efficient use of dockless devices." Mot. at

12   11. But the Court may "not simply accept the [government's] invocation of a

13   'special need.'" *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001). Instead, it

14   must undertake "a 'close review' of the scheme at issue." *Id.* (quoting *Chandler v.*

15   *Miller*, 520 U.S. 305, 321 (1997)). LADOT's insistence on the legality of

16   regulating scooter companies *in general* is therefore irrelevant to whether the

17   *location tracking requirement* is constitutionally reasonable.

18   A review of Plaintiffs' allegations reveals that MDS's location collection

19   scheme is unsupported by any specific regulatory purpose. LADOT developed the

20   data collection scheme to experiment with data collection, rather than to address

21   legitimate regulatory needs. Compl. ¶ 35. At the time of the Complaints' filing,

22   LADOT had failed to respond to a binding Los Angeles City Council directive to

23   provide "specific regulatory purposes for the collection and use of each type of

24   data required by MDS" by February 25. Compl. ¶ 39. Further, the City Council's

25   mandate to LADOT to create a permitting program included requirements that did

26   not need, or are otherwise ill-served by, MDS's location gathering scheme. *See,*

27   *e.g.*, Compl. ¶ 37 (citing example of geographic vehicle distributions as not

28   requiring GPS coordinates of riders). LADOT's Motion does not include any

specific use cases that *require* the collection of granular GPS coordinates, despite the program being in effect for over one year. *McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978) (administrative searches of public places "must be limited and no more intrusive than necessary to protect against the danger to be avoided, but nevertheless reasonably effective to discover the materials sought."). It is therefore not "limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *United States v. Grey*, 959 F.3d 1166, 1183 (9th Cir. 2020) (internal citation omitted).

That MDS's searches occur in an administrative, not criminal, context does not change this analysis. Warrant requirements for administrative searches may stand even in the absence of criminal penalties for failure to abide by the regulatory scheme. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 318 n.13 (1978) (invalidating administrative scheme concerning worksite inspections despite the scheme's failure to criminalize refusal of inspections). The searches here are no less invasive because they occur outside of a criminal law enforcement setting. *Safaie v. City of Los Angeles*, No. 19-3921 FMO (PJWx), 2020 WL 2501450, at *2 (C.D. Cal. Mar. 23, 2020) ("*Jones* itself does not suggest that its holding is limited to searches relating to potential criminal violations.").[7]

### 3.    *LADOT fails to provide riders a meaningful opportunity for pre-compliance review or any mode of neutral arbitration.*

MDS's location gathering mandates, like other "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are

---

[7] Notably, LADOT employs a sizeable enforcement division that enforces street safety rules and regulations, including for scooter riders. *See* "What We Do," LADOT Parking Enforcement, https://ladotparking.azurewebsites.net/parking-enforcement/ (last visited Aug. 11, 2020) (stating that "LADOT traffic officers enforce all parking laws in the California Vehicle Code and Los Angeles Municipal Code," issued 2.3 million citations last year, and "recover over 4,000 stolen vehicles annually").

*per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 419 (2015) (internal quotations and citation omitted). Whether that is in the form of an administrative subpoena, administrative review, or other means, suspicionless invasions on established expectations of privacy in the administrative context require some neutral evaluation to be reasonable. *Id.* at 420. MDS provides for none of this, either for the operators or for riders like Plaintiffs.

LADOT claims that such pre-compliance review is unnecessary, arguing that scooters (or perhaps vehicles in general) are "closely regulated industries" that form an exception to the general administrative search requirements. Not so. The *Patel* Court emphasized that the "closely regulated industry" exception to ordinary Fourth Amendment rules is a narrow one that the Court has only applied to four industries (liquor sales, firearms dealing, mining, and running an automobile junkyard) with a "history of government oversight." *Patel*, 576 U.S. at 424. Scooters specifically, and public vehicle ride shares generally, are not among them. In *Patel*, even a highly regulated industry like hotel management did not fall within this category, let alone a novel industry like vehicle ride shares and electronic scooters. *Id.* at 425 ("History is relevant when determining whether an industry is closely regulated.").

LADOT relies heavily on a line of cases brought by taxi cab drivers in New York and Washington, D.C., challenging various regulatory rules that require cab operators to transmit data concerning their business to regulatory authorities. Mot. at 9–11 (citing cases). But expectations of privacy at workplaces in regulated industries diminish markedly as compared to those that private individuals enjoy outside of working hours. *Skinner*, 489 U.S. at 627 (in considering railroad workers, "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered

employees."); *see Buliga v. New York City Taxi Limousine Comm'n*, No. 07 CIV. 6507 (DLC), 2007 WL 4547738, at *2 (S.D.N.Y. Dec. 21, 2007) ("Adults who choose to participate in a heavily regulated industry, such as the taxicab industry, have a diminished expectation of privacy, particularly in information related to the goals of the industry regulation."). The GPS requirement challenged in those cases does not appear to be any more invasive than the pre-digital requirement that cab drivers record start and location points. *Id.* ("Taxicabs in New York City have long been subject to regulation by the TLC, and those regulations have required cabdrivers to report not only the times and locations of trips but also the amount of fares."); *Carniol v. New York City Taxi & Limousine Comm'n*, 975 N.Y.S.2d 842, 845 (Sup. Ct. 2013) (regulations were designed in part to prevent persistent problem with overcharging of fares to riders).

Conversely, owners and renters of private scooters expect no such regulation, and no history of regulatory necessity demands scooter companies provide detailed start, stop, and route information to regulators. *Patel*, 576 U.S. at 424 (exceptions for closely regulated business are to be construed narrowly). Indeed, few scooter riders, if any, would know that LADOT collects *en masse* their GPS coordinates. *See Carniol*, 975 N.Y.S.2d at 848 (diminished expectation of privacy in part due to notice provided to drivers of the GPS collection system).

Even if some strained interpretation of "closely regulated" industries could encompass electronic scooter sharing, MDS fails the three additional criteria that such industries must establish to survive Fourth Amendment scrutiny: (1) the search must be informed by a substantial government interest; (2) the search must be necessary to further the regulatory scheme; and (3) the search program must provide a constitutionally adequate substitute for a warrant. *Patel*, 576 U.S. at 426. Plaintiffs allege that LADOT possesses no substantial government interest in collecting precise location information, and communicated none in response to the City's request. Compl. ¶¶ 34–40. Plaintiffs also plausibly allege that individualized

location gathering is not necessary to advance broad-based transportation planning goals, and certainly not with the availability of privacy-preserving techniques that can dramatically cut the sensitivity and precision of the data. *Id*. Finally, MDS provides riders with *zero* protections or reviews; riders must, without any knowledge, provide their location and movement information as a condition of riding an electric scooter within City limits, and have no way to know that such a location gathering scheme exists other than if they are regular readers of niche transportation industry press. *Id.* at ¶ 32.

## II.   PLAINTIFFS MAY SEEK RELIEF UNDER CALECPA FOR LADOT'S UNLAWFUL LOCATION COLLECTION.

When the Legislature enacted CalECPA in 2015, it intended to clarify and strengthen the legal protections against government access to electronic information that existed at the time, including under the federal and California Constitutions and the restrictions in the federal Electronic Communications Privacy Act.[8] Protecting people's location information is at the core of CalECPA's rigorous requirements.  *See* Cal. Pen. Code §§ 1546(d) (including location information in the definition of "electronic communication information"); 1546(g) (including location information in the definition of "electronic device information.").

---

[8] *See* Assem. Comm. on Privacy & Consumer Protection, Analysis of SB 178, as amended June 2, 2015, p. 6 ("Unfortunately, technology continued to advance rapidly since the [federal ECPA's] inception nearly 30 years ago and amendments to the Act have not always kept pace. . . . The author contends that the federal statute 'has not been meaningfully updated to account for modern technology,' ... [and] also cites a variety of situations where California law already explicitly requires a warrant for many kinds of information . . . . As a result, the author and supporters believe that existing law is insufficient to protect all forms of electronic communications and their meta-data  . . .").

99901-10237/3845714.1

1

2

### A.    CalECPA applies to all government entities; it is not limited to the criminal context.

3   LADOT argues that CalECPA's presence in the Penal Code, and the

4   language of Penal Code Section 690, limit the application of CalECPA to criminal

5   actions. Mot. at 14–16. LADOT's argument cannot be squared with the text of

6   CalECPA and misreads Section 690.

7   The Court's analysis of CalECPA must begin with the language of the

8   statute. If a statute's language is clear, then "the Legislature is presumed to have

9   meant what it said, and the plain meaning of the language governs." *Kizer v.*

10  *Hanna*, 48 Cal. 3d 1, 8 (1989). Here, CalECPA explicitly limits government access

11  to information by prohibiting "government entities" from compelling the

12  production of electronic communication information or electronic device

13  information without appropriate legal process, like a search warrant, wiretap order,

14  or subpoena. Cal. Pen. Code §1546.1(a)–(c).

15  This prohibition applies to all "government entities," and is not limited to

16  criminal actions. CalECPA defines "government entity" as "a department or

17  agency of the state or a political individual acting for or on behalf of the state or a

18  political subdivision thereof." Cal. Pen. Code §1546(5)(i). And the City of Los

19  Angeles is a political subdivision of the state, both under California law[9] and

20

21   [9] Statutory definitions of "political subdivision" throughout California law
include cities. *See* Cal. Gov. Code § 8698 (a political subdivision is defined as "the

22  state, any city, city and county, county, special district, or school district or public
agency authorized by law"); Cal. Gov. Code § 8557 (defining "political

23  subdivision" as any city, city and county, county, district, or other local
governmental agency or public agency authorized by law"); Cal. Elec. Code

24  § 14026 (a political subdivision is defined as "a geographic area of representation
created for the provision of government services, including, but not limited to, a

25  general law county, charter city, charter city and county, school district,
community college district, or other district organized pursuant to state law"); Cal.

26  Pub. Util. Code § 1402 (a political subdivision is defined as "a county, city and
county, city, municipal water district, county water district, irrigation district,

27

28

(cont'd)

1    federal ECPA.[10] The Court's analysis should end here: as a government entity, the

2    City of Los Angeles must comply with CalECPA.

3         Even if the Court were to seek further inquiry, CalECPA's placement in the

4    Penal Code is irrelevant, as demonstrated by the directly analogous Federal ECPA.

5    Like CalECPA, the limitations on government access to information in federal

6    ECPA apply to all "governmental entities," defined as "a department or agency of

7    the United States or any State or political subdivision thereof." 18 U.S.C.

8    § 2711(4). Agencies with solely civil law-enforcement authority like the Federal

9    Trade Commission must comply with ECPA's limits.[11] *See F.T.C. v. Netscape*

10   *Commc'ns Corp.*, 196 F.R.D. 559, 559 (N.D. Cal. 2000) (holding that the FTC

11   could not compel production of documents because of ECPA's limits on

12   government entities' access to information). This is despite the fact that, like

13   CalECPA, federal ECPA is located in the section of the United States Code

14   addressing crimes and criminal procedure, Title 18. Like its federal precursor,

15   CalECPA applies to *all* government entities seeking access to information, and is

16   not limited by its location in the code.

17        Other provisions of CalECPA confirm that it applies beyond criminal

18   actions. First, one way that government entities can comply with CalECPA is

19   through "a subpoena issued pursuant to existing state law," so long as that

20   subpoena is "not sought for the purpose of investigating or prosecuting a criminal

21   offense." Cal. Pen. Code §1546.1(b)(4). Similarly, CalECPA allows government

22   

23   public utility district, or any other public corporation"); Cal. Lab. Code § 1721 (a

24   political subdivision "includes any county, city, district, public housing authority, or public agency of the state, and assessment or improvement districts").

25        [10] *Doe v. City of San Diego*, No. 12-CV-0689-MMA DHB, 2013 WL

26   2338713, at *4 (S.D. Cal. May 28, 2013) (holding that "the City of San Diego and the San Diego Police Department are clearly 'governmental entities' within the

27   meaning of [ECPA].").

28        [11] The Federal Trade Commission is directed by statute to certify any criminal matters to the Department of Justice. 15 U.S.C. § 56(b).

entities to "use an … administrative or civil discovery subpoena" to reach certain kinds of information. Cal. Pen. Code § 1546.1(i). CalECPA simply cannot be limited to criminal actions when some provisions apply *only* if the government is *not* investigating or prosecuting a crime.

Second, CalECPA's exceptions demonstrate that all government demands for electronic information are within its scope. In particular, Section 1546.1(j) allows the Public Utilities Commission ("PUC") and State Energy Resources Conservation and Development Commission ("SERCDC") to obtain energy or water supply and consumption information under applicable state laws. Cal. Pen. Code § 1546.1(j). If CalECPA only applied to criminal proceedings, there would be no need for an exception for access to energy and water-supply information by regulatory agencies like the PUC and SERCDC. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (it is a "cardinal principle of statutory construction" that the statute be interpreted such that "no clause, sentence, or world shall be superfluous") (internal citation omitted); *City of San Jose v. Superior Court*, 5 Cal. 4th 47, 55 (1993) ("We ordinarily reject interpretations that render particular terms of a statute mere surplusage").

Finally, Section 690 of the Penal Code is not to the contrary. That section, passed in 1951, specified that Part II of the Penal Code applied to "municipal and inferior courts." *People v. Ross*, 221 Cal. App. 2d 443, 446 (Ct. App. 1963). Section 690 therefore expanded application of certain rules to courts where they might not previously have applied. It did not, as LADOT argues, limit the legal requirements in the Penal Code from applying to contexts outside of criminal prosecutions. CalECPA itself leaves no doubt as to its scope: all government entities, including cities, must comply.

**B.    CalECPA gives Plaintiffs the right to seek relief in this Court for the unlawful collection of their location information.**

LADOT contends that Plaintiffs are unable to seek relief in this Court

because CalECPA Section 1546.4(b) provides that the Attorney General can commence a civil action to compel compliance with CalECPA. Mot. at 16–17. LADOT is incorrect.

Under Section 1546.4(c), "an individual whose information is targeted" in a manner inconsistent with the federal or state constitutions or CalECPA can seek "to void or modify the warrant, order, or process, or to order the destruction of any information" unlawfully obtained. Cal. Pen. Code § 1546.4(c). Service providers who receive unlawful process have the same right. *Id.* MDS targets Plaintiffs' information in violation of CalECPA and the U.S. and California Constitutions. Compl. ¶¶ 42–60. CalECPA's legislative history shows that these rights to address violations in court, held by the Attorney General, service providers, and individuals whose information was targeted by unlawful process, were all aspects of a single goal: to provide "authorization to affected entities and the Attorney General to take action to uphold" CalECPA.[12]

LADOT's motion to dismiss focuses on Penal Code Section 1546.4(b), but offers no argument for why Plaintiffs cannot seek relief under the Penal Code Section that forms the basis for their claim here: Section 1546.4(c). Mot. at 16–17; Compl. ¶ 60. CalECPA gives Plaintiffs that right. For the aforementioned reasons, LADOT's motion to dismiss should be denied.

## III.   PLAINTIFFS PROPERLY NAME LADOT AS A DEFENDANT.

LADOT also moves to dismiss the Department of Transportation, arguing that it is not a "person" subject to suit under 42 U.S.C. § 1983.[13] LADOT's motion

---

[12] *See* Assem. Comm. on Privacy & Consumer Protection, Analysis of SB 178, as amended June 2, 2015, p. 8 (explaining that CalECPA "requires reasonable notification to the target of the request, prohibits the use in court of information obtained in violation of these requirements, and *provides authorization to affected entities and the Attorney General to take action to uphold these requirements*.") (emphasis added).

[13] LADOT does not seek dismissal of the Department of Transportation with respect to Plaintiffs' claims under CalECPA.

1   should be denied for two reasons. First, LADOT misstates the holding of *United*

2   *States v. Kama*, 394 F.3d 1236, 1239 (9th Cir. 2005) as "holding municipal police

3   departments are not considered 'persons' within the meaning of 42 U.S.C. § 1983."

4   Mot. at 17. In fact, *Kama* says nothing of the sort. Rather, *Kama* held that a

5   defendant had waived an objection to the district court's purposed abuse of

6   discretion. *Kama*, 394 F.3d at 1238. A concurring opinion in *Kama* includes a

7   passing reference to the question of whether municipal departments are subject to

8   suit under Section 1983, but nothing more. *Id.* at 1239. *Kama* does not command

9   dismissal of LADOT.

10       Second, *Hurth v. County of Los Angeles* provides the appropriate framework

11   for analyzing the Department of Transportation's presence in this case. No. 09-

12   5423 SVW (PJWx), 2009 WL 10696491, at *5 (C.D. Cal. Oct. 28, 2009). In that

13   case, the court denied the County of Los Angeles' motion to dismiss the Los

14   Angeles County Sheriff's Department, rejecting the reasoning of some courts that

15   have held municipal departments are not "persons" under Section 1983. Noting

16   that *Monell v. New York City Department of Social Services*, 436 U.S. 658, 660–61

17   (1978), permitted a Section 1983 suit against a city department, the court in *Hurth*

18   held that municipal departments may be subject to suit. *Hurth*, 2009 WL

19   10696491, at *5. Under *Hurth*'s reasoning, LADOT should remain a defendant.

## CONCLUSION

21       For the foregoing reasons, Plaintiffs respectfully request the Court deny

22   LADOT's Motion to Dismiss.

24   DATED:  August 21, 2020          Respectfully submitted,

25                                    By:   /s/ *Mohammad Tajsar*

26                                          Mohammad Tajsar
                                            Counsel for Plaintiffs